## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MITCHELL MORROW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:20-cv-00664-GCS** |
| | ) | |
| **WEXFORD HEALTH SOURCES,** | ) | |
| **INC., DEBORAH BLACKBURN, &** | ) | |
| **DR. VENERIO SANTOS,** | ) | |
| | ) | |
| **Defendants.** | | |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

### I.    INTRODUCTION AND PROCEDURAL HISTORY

Pending before the Court are Defendants' Motions for Summary Judgment. (Doc. 83, 86). Defendants Dr. Venerio Santos ("Santos") and Wexford Health Sources, Inc. ("Wexford") filed their Motion for Summary Judgment and Memorandum of Support on July 19, 2022. (Doc. 83, 84). Defendant Deborah Blackburn, CMT LPN ("Blackburn") also filed her Combined Motion for Summary Judgment and Memorandum of Support on July 19, 2022. (Doc. 86). Plaintiff filed his Response in Opposition to the Motions for Summary Judgment on January 31, 2023. (Doc. 99). For the reasons delineated below the Court, **GRANTS** the Motions for Summary Judgment. (Doc. 83, 86).

Plaintiff Mitchell Morrow, a former inmate of the Illinois Department of Corrections ("IDOC"), last housed in Centralia Correctional Center ("Centralia") brought this suit against Defendants Wexford, Blackburn, and Santos pursuant to 42 U.S.C. § 1983

on July 8, 2020. (Doc. 1). In his Complaint, Plaintiff alleges that the Defendants were deliberately indifferent in treating his anemia and shoulder pain, in violation of the Eighth Amendment. *Id.* at p. 11-16. On November 5, 2020, the Court conducted its preliminary review of Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A. (Doc. 13). The Court construed Plaintiff's allegations into the following counts:

> **Count 1:** Eighth Amendment deliberate indifference claim against D. Blackburn for failing to review Plaintiff's file and providing him care for his anemia.

> **Count 2:** Eighth Amendment deliberate indifference claim against Dr. Santos for failing to provide Plaintiff with proper care for his anemia and shoulder pain.

> **Count 3:** Eighth Amendment deliberate indifference claim against Wexford Health Sources, Inc. for having policies and practices which caused Plaintiff to receive improper care for his anemia and shoulder pain.

*Id.* at p. 4. All counts proceeded against each Defendant as stated above. *Id.* at p. 5-7. On March 22, 2021, Defendants Santos and Wexford filed their Motion for Summary Judgment for Failure to Exhaust Administrative Remedies along with a Memorandum in Support. (Doc. 42, 43). Defendant Blackburn did not file a Motion for Summary Judgment on the issue of exhaustion. Plaintiff filed a Response in Opposition to Defendants' Motion and an accompanying Memorandum of Support on May 21, 2021. (Doc. 51, 52). On July 9, 2021, the Court held a hearing on the Motion. (Doc. 55). On July 19, 2021, the Court granted the Motion as to Plaintiff's allegations that Defendant Wexford adopted unconstitutional policies and practices which caused him to receive improper care for his shoulder pain, as stated in Count 3. (Doc. 56, p. 13). However, the Court denied summary

judgment as to Plaintiff's claims in Count 3 relating to the treatment of his anemia. *Id.*

The Court also denied summary judgment as to Count 2. *Id.*

## II.    BACKGROUND

### A.    Plaintiff's Early History of Anemia and Treatment at Lawrence Correctional Center

Between 2010 and July 1, 2015, Plaintiff was incarcerated at Lawrence Correctional Center ("Lawrence"). (Doc. 84, Exh. 1, p. 1-12). On July 2, 2010, Plaintiff tested positive for "bright red" blood in his stool and was evaluated for anemia. *Id.* at p. 5. Upon examination, it was discovered that Plaintiff had a small non-prolapsed hemorrhoid, but his abdomen was determined to be unremarkable. *Id.* The nurse practitioner ("NP") examining Plaintiff ordered a Complete Blood Count ("CBC") to rule out anemia secondary to his hemorrhoid. *Id.*

On August 2, 2010, Plaintiff was seen for a follow up appointment to address his hemorrhoid. (Doc. 84, Exh. 1, p. 6). During the follow up appointment, the NP noted Plaintiff's healthy appearance and described his abdomen as unremarkable. *Id.* However, Plaintiff's labs indicated that his iron was low. *Id.* To combat Plaintiff's iron deficiency, Plaintiff was prescribed an iron supplement for four months. *Id.* A Complete Metabolic Panel ("CMP") was also ordered to check Plaintiff's iron levels in 6 months-time. *Id.*

Over the course of the next year, Plaintiff was monitored for rectal bleeding and anemia. (Doc. 84, Exh. 1, p. 7-11). Plaintiff's iron supplement was renewed twice after medical professionals reviewed his lab work. *Id.* at p. 7, 8. Plaintiff was also prescribed Metamucil and additional follow-up labs were conducted to monitor Plaintiff's

condition. *Id.* at. p. 7-11.

On May 1, 2012, Plaintiff's Metamucil and iron supplement prescriptions expired. (Doc. 84, Exh. 1, p. 9). On July 3, 2012, Plaintiff reported to an NP that his iron prescription was stopped. *Id.* at p. 10. However, the NP noted that Plaintiff had no complaints of fatigue or rectal bleeding, nor was he feeling cold. *Id.* Therefore, only Plaintiff's Metamucil prescription was renewed. *Id.* The NP also ordered another CBC and indicated that she would follow up with Plaintiff about his lab results in one to two weeks. *Id.* Accordingly, on July 16, 2012, during a follow-up appointment, an NP noted that Plaintiff's iron levels were within normal limits, and Plaintiff's anemia was documented as "resolved." *Id.* at p. 11. Plaintiff did not report any additional rectal bleeding to the medical staff at Lawrence during the remainder of 2012 until his transfer to Centralia Correctional Center in 2015. (Doc. 84, Exh. 2, p. 74:20-75:3).

## B.   Plaintiff's Treatment for Anemia at Centralia Correctional Center

On July 1, 2015, Plaintiff was transferred from Lawrence to Centralia Correctional Center ("Centralia"). (Doc. 84, Exh. 1, p. 12). The transfer document did not list anemia as either a current acute condition or chronic condition.[1] *Id.* As such, anemia was not added to Plaintiff's "problem list." *Id.* at p. 26. Additionally, Plaintiff did not report any rectal bleeding to medical staff at Centralia between 2015 and 2019. (Doc. 84, Exh. 2, p. 76:16-19).

Plaintiff was examined numerous times by medical staff at Centralia for unrelated

---

[1]      The transfer document notes that Plaintiff suffered from shoulder impingement syndrome in his left shoulder. It also listed "HTN" and "Hyperlipidemia" as chronic conditions. (Doc. 84, Exh. 1, p. 12).

concerns during 2018. On May 3, 2018, a nurse conducted a periodic medical history with Plaintiff, and Plaintiff did not report his prior acute anemia diagnosis. (Doc. 84, Exh. 1, p. 21). On May 9, 2018, Plaintiff was seen for a routine physical by a non-defendant physician. *Id.* at p. 22. Plaintiff did not report his prior acute anemia diagnosis or ongoing rectal bleeding to this physician either. *Id.* Plaintiff saw Defendant Blackburn on May 14, 2018, to assess his complaints of shortness of breath. (Doc. 86, Exh. 3, p. 1-2). Plaintiff's pulse ox was documented as being at one hundred percent, and Plaintiff only reported that he was experiencing symptoms when exerting himself or lifting. *Id.*  On July 20, 2018, Plaintiff was seen by Defendant Dr. Santos for reports of bilateral lower edema with a history of hypertension with medications. (Doc. 84, Exh. 1, p. 27). While Plaintiff informed Dr. Santos that he was experiencing shortness of breath and swelling in his lower extremities, Plaintiff did not report weakness, fatigue, lack of energy, or any bleeding commonly associated with anemia. *Id.*; (Doc. 84, Exh. 2, p. 78:17-79:5). Santos assessed Plaintiff as having bipedal edema secondary to his Norvasc prescription, and he recommended that Plaintiff continue his medications but reduce his salt intake. (Doc. 84, Exh. 1, p. 27).

Plaintiff was next seen in April 2019, during a nurse sick call for dizziness, weakness, and pain in his hands and feet after exercise. (Doc. 84, Exh. 1, p. 29). During the examination on April 18, 2019, Plaintiff informed the nurse of his prior anemia diagnosis and noted that he had previously taken iron pills. *Id.* The nurse referred Plaintiff to the doctor for possible labs. *Id.* Dr. Santos saw Plaintiff the day after, on April 19, 2019, in response to the nurse's referral. *Id.* at p. 28. Santos ordered various tests

including a basic metabolic panel ("BMP") and a CBC with additional labs for iron, T1BC,

B12 and folate levels, along with a hemoccult test to rule out anemia or a GI bleed. *Id.*

Two out of the three hemoccult tests came back positive for blood. *Id.* at p. 30. The lab-

work Dr. Santos ordered was conducted on April 23, 2019, and it revealed that Plaintiff's

hemoglobin ("HGB") and hematocrit ("HCT") values were critical.[2] (Doc. 84, Exh. 1, p.

31). The lab notified Centralia of Plaintiff's critical values on April 24, 2019. *Id.* Dr. Santos

was immediately alerted, and Plaintiff was sent to the Emergency Room for evaluation

for a potential GI bleed. *Id.*

After being transferred to SSM St. Mary's Hospital in Centralia that same day for

treatment, Plaintiff was diagnosed with chest pain, "iron deficiency / anemia due to

chronic blood loss," weakness, thrombocytosis, and hemorrhoids. (Doc. 84, Exh. 1, p. 75).

Plaintiff reported to the hospitalist that "he ha[d] been seeing some blood in [his] stool

lately . . . constant for the last . . . week, that is bright red in color." *Id.* at p. 77. Plaintiff

also reported that he had a history of hemorrhoids and iron deficiency. *Id.*  The hospitalist

ordered a hemoccult test, a single view chest x-ray, CBC labs, PT and PTT panels,

Troponin level lab, and an EKG. *Id.* at p. 76. Plaintiff was also given a .9% NaCl infusion

and Protonix. *Id.* Plaintiff then underwent a colonoscopy and EGD while he was

admitted. *Id.* at p. 14. After being stabilized, Plaintiff was returned to Centralia on April

28, 2019. *Id.* at p. 78.

On April 29, 2019, Dr. Santos referred Plaintiff to a specialist for a GI bleed with

---

[2]     Plaintiff's HGB was at 3.4 and his HCT was 14.4. (Doc. 84, Exh. 1, p. 31).

acute anemia; he noted that an EGD and colonoscopy revealed that internal hemorrhoids and gastric esophagitis were the source of the bleeding. (Doc. 84, Exh. 1, p. 16). One month later, on May 30, 2019, Plaintiff underwent a hemorrhoidectomy, which resolved the bleeding and anemia. *Id.* at p. 35; (Doc. 84, Exh. 2, p. 94:2-9).

**C.**    **Plaintiff's Treatment for Shoulder Pain at Centralia Correctional Center**

Prior to April 2019, Plaintiff did not report any issues regarding his shoulder to medical staff at Centralia. (Doc. 84, Exh. 2, p. 99:19-100:7). However, Plaintiff's transfer document indicates that Plaintiff suffered from shoulder impingement syndrome in his left shoulder. (Doc. 84, Exh. 1, p. 12).

On April 24, 2019, while Plaintiff was admitted for critical lab values related to his GI bleed, an x-ray was taken in response to Plaintiff's reported chest pain. (Doc. 84, Exh. 2, p. 78). The x-ray noted that Plaintiff had "severe degenerative changes [in his] left shoulder within the field of view." *Id.* However, Plaintiff's discharge summary from the hospital did not note any specific diagnosis or recommended care plan for his shoulder. *Id.*

On May 17, 2019, Plaintiff was seen by Dr. Santos for complaints related to his left shoulder. (Doc. 84, Exh. 1, p. 34). Dr. Santos noted Plaintiff's self-reports of left shoulder pain post hospitalization in which he was handcuffed in bed. *Id.* Upon physical examination, Santos identified tenderness in Plaintiff's anterior and lateral left armpit with pain on rotation. *Id.* These symptoms led Santos to diagnose Plaintiff with tendonitis of his left shoulder. *Id.* Due to Plaintiff's recent history of a GI bleed, Santos prescribed 500mg of Tylenol three times a day as needed for pain relief for six months. *Id.*

On July 21, 2019, Plaintiff was seen by a nurse for a "frozen [left] shoulder" due to his prior hospitalization. (Doc. 84, Exh. 1, p. 37). Plaintiff reported that he was experiencing a limited range of motion noting that he could only lift his arm to shoulder height. *Id.* Plaintiff rated his pain at a level four out of ten. *Id.* The nurse noted that Plaintiff experienced limited range of motion because of the pain. *Id.* Plaintiff refused the Ibuprofen prescribed by the nurse due to his recent GI bleed history. *Id.* The nurse ultimately decided to refer Plaintiff to a physician for further evaluation. *Id.*

Plaintiff was seen by Dr. Santos to address the shoulder pain on July 23, 2019. (Doc. 84, Exh. 1, p. 38). Defendant Santos noted that Plaintiff was experiencing a frozen left shoulder caused by degenerative disease of the left shoulder. *Id.* Santos prescribed Plaintiff 500 mg of Tylenol, warm compresses, and range of motion exercises to address Plaintiff's pain. *Id.*

On November 1, 2019, Plaintiff was seen once again by a nurse for continued left shoulder pain. (Doc. 84, Exh. 1, p. 39). Plaintiff rated his pain as an eight out of ten and described the pain as "constant" and "stabbing" in nature. *Id.* Plaintiff indicated to the nurse that he had been experiencing this pain for six to eight months and that he was still doing the movement exercises as prescribed, but that they were "not helping like [they] did before." *Id.* The nurse observed that Plaintiff's left shoulder had limited movement and that rotation increased his pain. *Id.* The nurse prescribed Plaintiff 325 mg of Acetaminophen three times per day and indicated that he should follow-up if his symptoms worsened or interfered with his daily functioning. *Id.*

Plaintiff was seen by non-defendant physician, Dr. Meyers for complaints of

shoulder pain on November 11, 2019. (Doc. 84, Exh. 1, p. 40). Plaintiff reported to Dr. Meyers that he had sustained repeated injuries to his left shoulder as a youth; as a result, he was experiencing pain and a decreased range of motion. *Id.* Dr. Meyers noted that Plaintiff's prior x-rays showed degenerative disease of the left shoulder without swelling or muscle atrophy. *Id.* Dr. Meyers assessed Plaintiff as having arthritis of the left shoulder secondary to Plaintiff's prior injuries. *Id.* Dr. Meyers prescribed Plaintiff 500 mg of Tylenol, three times a day as needed for six months and a muscle-rub for pain. *Id.* at p. 41.

Over six months later, on June 5, 2020, Plaintiff returned to the health care unit regarding the pain in his left shoulder and requested that his Tylenol prescription be renewed. (Doc. 84, Exh. 1, p. 42). Plaintiff reported to the nurse that he was experiencing stiffness in his left shoulder and rated his pain as seven out of ten. *Id.* He further noted that he had been experiencing this pain for one year. *Id.* However, the nurse did not note any obvious signs of Plaintiff's discomfort and described his shoulder as within normal limits. *Id.* Because Plaintiff was requesting a reauthorization of his prescription, the nurse referred Plaintiff to a physician for further evaluation. *Id.* Plaintiff's Tylenol prescription was subsequently reauthorized on June 8, 2020. *Id.* at p. 43.

On July 5, 2020, Plaintiff was seen again at nurse sick call regarding pain in his left shoulder. (Doc. 84, Exh. 1, p. 44). Plaintiff claimed that Tylenol was no longer an effective form of pain relief and that his pain level was an eight out of ten. *Id.* Plaintiff indicated that he had been experiencing constant chronic stiffness for a year. *Id.* The nurse noted that Plaintiff was holding his arm in obvious discomfort during her physical exam. *Id.*

However, the nurse ultimately found that Plaintiff's range of motion in his left shoulder was within normal limits. *Id.* The nurse referred Plaintiff to a physician for additional evaluation. *Id.*

Plaintiff was seen by Defendant Dr. Santos for his shoulder pain pursuant to the nurse's recommendation on July 7, 2020. (Doc. 84, Exh. 1, p. 45). Dr. Santos observed no swelling and no redness around Plaintiff's shoulder but noted his limited range of motion on abduction and rotation. *Id.* Santos ordered an x-ray of Plaintiff's left shoulder which revealed "severe degenerative change with osteoarthritis of the AC as well as glenohumeral joint and prominent osteophyte formation at the level of the proximal humerus with re-modeling and flatting of the glenoid as well as humeral head. No acute bony fracture [was] seen." *Id.* at p. 72. On July 15, 2020, non-defendant physician Dr. Shah followed up with Plaintiff regarding his shoulder post x-ray. (Doc. 84, Exh. 1, p. 47). Dr. Shah diagnosed Plaintiff with "shoulder arthritis" and ordered a low bunk permit and exercise; he also discontinued Tylenol and ordered that Plaintiff take Ibuprofen for three months. *Id.*

Plaintiff made no further complaints regarding his shoulder to staff at Centralia. Plaintiff was transferred from Centralia to North Lawndale Adult Transitional Center on December 3, 2021. (Doc. 84, Exh. 2, p. 17:5-6). Plaintiff asserts that he then began seeing an outside provider at UIC Health for pain in his shoulder. (Doc. 99, p. 5). In February 2022, Plaintiff received a cortisone shot for his shoulder pain from an outside provider. *Id.* at p. 14. Plaintiff is reportedly due to receive a second cortisone shot soon. *Id.* at p. 5.

### III.   LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)(citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009)(stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in fact-finding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*,

477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

## IV.   DISCUSSION

### A.   Plaintiff's Deliberate Indifference Claims against Defendants Blackburn and Santos

To establish a cause of action under 42 U.S.C. § 1983, Plaintiff must establish: (1) that a defendant was deliberately indifferent; (2) there was a serious medical need; and (3) that substantial harm resulted from any such indifference. *See Thomas v. Walton*, 461 F. Supp.2d 786, 793 (S.D. Ill. 2006); *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). Plaintiff first asserts that Defendant Blackburn was deliberately indifferent by failing to provide proper treatment for his anemia, in part because she failed to review his medical

records. (Doc. 86, Exh. 2, p. 131:19-134:6). Next, Plaintiff asserts that Defendant Santos was deliberately indifferent due to his failure to properly treat his anemia and shoulder pain. (Doc. 99, p. 7). Defendants, in turn, assert that Plaintiff's anemia did not amount to a serious medical need. (Doc. 84, p. 9; Doc. 86, p. 6-7).  Further, they argue that Defendants Blackburn and Santos did not cause Plaintiff to further suffer harm through their respective treatment plans. (Doc. 84, p. 12-13; Doc. 86, p. 8-9).

      1.      **Plaintiff's Acute Anemia**

Defendants Santos and Blackburn assert that Plaintiff did not suffer from a serious medical condition or present to them with a serious medical need prior to April 2019. (Doc. 84, p. 9; Doc. 86, p. 6-7). Plaintiff, however, asserts that his historic episodes of anemia constituted a serious medical condition, and therefore required additional monitoring by Defendants prior to the April 2019 incident. (Doc. 99, p. 7). Because Plaintiff's anemia prior to the recurrence in 2019 was deemed to be "resolved," the Court finds that Plaintiff did not suffer a serious medical need between 2012 and the recurrence in 2019.

A "serious medical need" is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious even a lay person would easily recognize the necessity for a doctor's attention." *Edwards v. Snyder*, 478 F.3d 827, 830-831 (7th Cir. 2007)(quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Indications of a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and

substantial pain." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). Even still, it is not true to say that every ache and pain or medically recognized condition involving some discomfort are serious medical needs. *See, e.g.*, *Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir. 1980)(finding that failure to treat a common cold did not constitute deliberate indifference to a serious medical need); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)(finding that a toe whose toenail had been removed did not amount to a serious medical need). However, the Seventh Circuit has found that "chronic or degenerative conditions that cause harm that may escalate and have significant future repercussions unless adequately treated[]" can qualify as a serious medical need. *McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016).

In this case, the medical staff at Lawrence determined that Plaintiff's anemia was resolved in July 2012 because Plaintiff's iron levels had remained stable for two months without medication. (Doc. 84, Exh. 1, p. 11). Therefore, Plaintiff's anemia was classified as acute in nature and was not listed on his "problem list" as a chronic condition in his transfer documentation provided to Centralia. *Id.* at p. 12. Given these findings, the medical staff at Lawrence did not renew Plaintiff's iron supplement prescription prior to Plaintiff's transfer and only continued Plaintiff's prescription for fiber to alleviate Plaintiff's discomfort from a hemorrhoid. *Id.* at p. 11. Notably, Plaintiff did not require any medication to manage his iron levels between 2012 and 2019. As such, Defendants Blackburn and Santos were not required to preemptively monitor Plaintiff for anemia. Thus, during the period between 2012 and the 2019 reoccurrence, Plaintiff's anemia did not amount to a chronic condition that would have obligated Defendants Santos and

Blackburn to conduct further monitoring, and as such Plaintiff's condition at that time cannot be classified as a serious medical need.

Even if Plaintiff's anemia was determined to be a serious medical need, Plaintiff cannot demonstrate that he was harmed as a result of Defendant Blackburn's or Defendant Santos's treatment of his anemia prior to April 2019. Plaintiff asserts that Defendant Blackburn should have referred him to a physician immediately after his appointment with her on May 18, 2018, when Plaintiff complained of chest pain. (Doc. 86, Exh. 2, p. 142:10-21). Plaintiff asserts that had Defendant Blackburn looked at his complete medical file prior to determining her course of action, Plaintiff would have been referred to a physician sooner. (Doc. 86, Exh. 2, p. 133:21-135:15). Similarly, Plaintiff argues that Santos should have reviewed Plaintiff's entire medical file prior to his examination on July 20, 2018. (Doc. 99, p. 7). If he had done so, Plaintiff asserts that Santos would have ordered labs sooner, which would have prevented the April 2019 incident from occurring. *Id.* However, as Defendants argue, Plaintiff has failed to place any verifying medical evidence into the record that demonstrates Plaintiff suffered from any delay from either Defendant Blackburn's or Defendant Santos's treatment. (Doc. 84, p. 12-13; Doc. 86, p. 7).

At best, Defendants' failure to review Plaintiff's full medical records amounted to negligence as opposed to deliberate indifference. *See, e.g.*, *Green v. Wexford Health Sources*, Case No. 12 C 50130, 2016 WL 1214825, at *11 (N.D. Ill. Mar. 29, 2016)(stating that "[a]t most, [defendant's] failure to review [plaintiff's] full medical records . . . was negligence."); *Pryor v. Pat*, Case No. 3:09-CV-472-TLS, 2010 WL 4483467, at *4-5 (N.D. Ind.

Nov. 1, 2010)(noting that failure to review medical records to determine allergies after plaintiff told defendant he was allergic to some types of antibiotics was not deliberate indifference); *Harris v. Clarke*, No. 06 C 0230, 2008 WL 4866683, at *31 (E.D. Wisc. Nov. 10, 2008)(stating that "[e]ven if the records were available to [defendant] . . . and he did not review them [defendant may have been negligent, but more than negligence is required."). Moreover, had Defendants reviewed the medical records, the records would have revealed that Plaintiff's anemia had been resolved nearly six years prior. (Doc. 84, Exh. 1, p. 11). There is no indication in the record that Defendant Blackburn's and Santos's actions would have been substantially altered had such records been reviewed.

Further, as Defendants note, in order to assert that the constitutional violation was a delay in medical treatment, as opposed to the denial of medical treatment altogether, the plaintiff must provide "verifying medical evidence that he suffered from a substantial harm as a result of the delay." *Senisais v. Fitzgerald*, 940 F. Supp. 196, 199 (N.D. Ill. 1996); *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013). That verifying evidence must show that Plaintiff was, in fact, harmed by a delay in treatment as opposed to Plaintiff's underlying condition. *See Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). Evidence of a plaintiff's diagnosis and treatment standing alone is insufficient if it does not establish whether a delay exacerbated the plaintiff's condition or otherwise harmed him. *See Williams*, 491 F.3d at 715 (citing *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005). Such is the case here.

Plaintiff's anemic episode in 2019 was characterized by multiple physicians as acute anemia secondary to blood loss from hemorrhoids and gastric esophagitis. (Doc. 84, Exh. 1, p. 75). Consequently, there is no evidence within the record that conducting a

CBC sooner would have changed the course of events in this case. Plaintiff testified that he experienced consistent and heavy bleeding for at least a week before his appointment with Dr. Santos in April 2019. Yet, Plaintiff did not report this to medical clinicians at Centralia. (Doc. 86, Exh. 2, p. 137: 23-138:8). This bleeding was the precipitating event to Plaintiff's anemic state. Upon receiving Plaintiff's critical lab values, Dr. Santos immediately transferred Plaintiff to the hospital for further interventions and subsequently referred Plaintiff to a specialist after his release to address Plaintiff's underlying cause of anemia. (Doc. 84, Exh. 1, p. 31; Doc. 84, Exh. 1, p. 16). Defendant Blackburn never assessed Plaintiff while he was in this critical condition. (Doc. 84, Exh. 1, p. 29-31). Thus, neither Defendant Blackburn's nor Defendant Santos's treatment of Plaintiff's anemia amounted to deliberate indifference. Therefore, with respect to Plaintiff's anemia, Defendants' Motion for Summary Judgment is **GRANTED.**

### 2.   Plaintiff's Shoulder Pain

Plaintiff asserts that Defendant Santos was deliberately indifferent regarding his shoulder pain because Santos continued to prescribe Plaintiff Tylenol when Plaintiff complained about the medication's ineffectiveness. (Doc. 99, p. 10-11). Plaintiff also asserts that Santos exhibited deliberate indifference when he failed to order an x-ray of Plaintiff's shoulder in May 2019. *Id.* Instead, Santos waited to order an x-ray of Plaintiff's shoulder until July 2019. *Id.* Defendant asserts that the conservative progression of treatment adheres to accepted practice and therefore does not amount to deliberate indifference. (Doc. 84, p. 16-20). The Court agrees.

"Deliberate indifference may be inferred based upon a medical professional's

erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible did not base that decision on such a judgment." *Est. of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-262 (7th Cir. 1996). A prisoner's dissatisfaction with a physician's prescribed course of treatment does not give rise to a constitutional claim. *See Snipes*, 95 F.3d at 592. In contrast, deliberate indifference can be established through "medical treatment [that] is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Id.* (quotation and citation omitted).

Here, Defendant Santos had a valid clinical reason to continue using Tylenol as opposed to switching the medication protocol for Plaintiff. Plaintiff had just suffered an acute anemic episode less than a month prior, and Nonsteroidal anti-inflammatory drugs ("NSAID") are not considered a viable treatment option while a patient is still being monitored for residual bleeding. (Doc. 84, Exh. 2, p. 93:6-20). Plaintiff's CBC was monitored for six months after his anemic episode, thereby eliminating NSAIDs as a treatment option until late November 2019. (Doc. 84, Exh. 1, p. 36, 73). As such, Santos prescribed Plaintiff with range of motion exercises, Tylenol, and warm compresses to address Plaintiff's discomfort during this period. (Doc. 84, Exh. 1, p. 33). Plaintiff acknowledged that the movement exercises were initially helpful in alleviating his pain. (Doc. 86, Exh. 2, p. 114:13-22). The only relevant treatment option not utilized by Santos in the management of Plaintiff's pain was a topical capsaicin or duloxetine. (Doc. 84, Exh. 3). Such a minor departure from the gold standard of treatment does not amount to

deliberate indifference. Further, once NSAIDs were a valid treatment option, non-defendant physician Meyers prescribed Naproxen to Plaintiff, which further alleviated Plaintiff's symptoms. (Doc. 86, Exh. 2, p. 114:6-10).

As to Defendant Santos not ordering an x-ray sooner, diagnostic testing including an x-ray, is left up to the medical judgment of the treating clinician. As such, the difference of opinion as to when diagnostic testing should be ordered in and of itself does not amount to deliberate indifference. *See, e.g.*, *Jones v. Natesha*, 233 F. Supp.2d 1022, 1029-1030 (N.D. Ill. Dec. 5, 2002)(finding that use of a colonoscopy is a matter of medical judgment); *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)(finding that an x-ray or additional diagnostic testing is a matter for medical judgment). Here, Santos had x-ray images of Plaintiff's shoulder from his hospital stay in April 2019 that adequately documented Plaintiff's shoulder condition. (Doc. 84, Exh. 1, p. 76). As such, Santos may have believed that additional x-rays would not have changed his treatment plan, and therefore he may have concluded that additional imaging was unnecessary and duplicative. Thus, Defendants' Motion for Summary Judgment as to Plaintiff's shoulder pain is also **GRANTED.**

B. **Plaintiff's** *Monell* **Claim**

Plaintiff asserts that the alleged improper care he received was due to the result of several policies of Defendant Wexford Health Sources, Inc. ("Wexford"). This included: (1) a policy and practice of keeping an outdated health information system which failed to reveal his previous diagnosis of anemia; (2) a policy and practice of not providing follow-up care for inmates diagnosed with serious medical needs; (3) a policy and

practice of not providing a CBC during annual exams, which would have revealed Plaintiff's anemia; (4) a policy and practice of not providing ambulatory aids to inmates which led to Plaintiff having to walk to the healthcare unit and transport vehicle while in critical condition; and (5) a policy and practice of only providing Tylenol or Ibuprofen to inmates for pain regardless of their pain levels. (Doc. 1, p. 11-13). Defendant asserts that Plaintiff's allegations are "entirely unsupported." (Doc. 84, p. 13). Defendant believes that Plaintiff's allegations are "predicated on unsubstantiated issues with his own medical treatment rather than claims regarding a policy, practice, procedure or widespread custom and practice." *Id.*

For Plaintiff to succeed on his *Monell* claims, he must show that the alleged constitutional violations were caused by: "(1) an express policy that caused a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitute[d] a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). *See also Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). In other words, Plaintiff must show that "systematic and gross deficiencies in . . . [Wexford's] medical care system" caused his injuries, and that "a policymaker or official knew about these deficiencies and failed to correct them." *Daniel v. Cook Cty.*, 833 F.3d 728, 735 (7th Cir. 2016). Alternatively, Plaintiff must show that "the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon v. Cty of Cook*, 819 F.3d 343, 348 (7th Cir. 2016).

Plaintiff has not put forth sufficient evidence to demonstrate the existence of any unconstitutional policies or procedures on behalf of Wexford. Regarding any purported express policy, Plaintiff cannot show such a policy because he admitted that he has not reviewed any of Wexford's policies or procedures. (Doc. 84, Exh. 2, p. 95:8-10). Plaintiff also presents no evidence of an injury caused by a person with final policy making authority. Thus, the only avenue left available for Plaintiff to establish a *Monell* claim is to show a widespread custom, policy, or practice.

In determining whether a widespread custom, policy, or practice exists, it is important to distinguish on the one hand between isolated instances of wrongdoing or the acts of a few rogue employees, and other more widespread and systemic practices. *See Howell v. Wexford Health Sources, Inc*. 987 F.3d 647, 654 (7th Cir. 2021). Isolated incidents do not constitute a pattern of behavior that will support an inference of a deliberately indifferent custom, practice, or policy. *See, e.g.*, *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003)(stating that "proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference"). As such, *Monell* claims based on allegations of an unconstitutional practice or custom typically require evidence that the identified practice or custom caused multiple injuries. *See Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). While there is not a bright line rule as to the necessary quantity, quality, or frequency of conduct to show a widespread custom, policy, or practice, there must be evidence of a true corporate policy as opposed to a random isolated event. *See Howell,* 987 F.3d at 654.

In this instance, Plaintiff has not provided the Court with sufficient evidence

suggesting that any of these alleged policy violations or procedures negatively impacted other inmates. (Doc. 99, p. 10). The only additional pieces of information Plaintiff supplies to the Court in his Response to Defendants' Motion for Summary Judgment are that: (1) "Wexford admits that it did not provide any follow-up treatment or care for Plaintiff regarding his anemia diagnosis after 2012" until 2019 and that (2) "Wexford admitted that it does not provide a CBC with regularly scheduled [inmate] physical exams" unless clinically indicated. *Id.* at p. 17. These examples relate only to the Plaintiff's care and no one else's. Therefore, Plaintiff has not established the existence of a widespread custom, policy, or practice. *See, e.g., Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008)(stating that "it is necessarily more difficult for a plaintiff to demonstrate [a] custom based only on his own experience because what is needed is evidence that there is a true municipal policy at issue, not a random event.") (internal quotations omitted).

As to the specific customs, policies, and practices identified, Plaintiff has not supplied sufficient evidence to allow a reasonable jury to rule in Plaintiff's favor. First, as to Plaintiff's allegation that Wexford has a "policy and practice of not providing ambulatory aids to inmates which led Plaintiff to having to walk to the healthcare unit and transport vehicle while in critical condition," there is no evidence in the record that Wexford was responsible for this decision. Even if such evidence did exist, there is no evidence that Plaintiff suffered any harm from walking to the transport vehicle.

As to Plaintiff's allegations that Wexford maintains an "outdated health information system which failed to reveal his prior diagnosis of anemia and d[id]not provide for follow-up care for inmates diagnosed with serious medical needs", Plaintiff's

own medical records directly contradict this finding. Plaintiff's transfer documents show that Plaintiff is a patient in the chronic hypertension clinic. (Doc. 84, Exh. 1, p. 10, 24). As such, medical providers closely monitor Plaintiff due to his complications associated with high blood pressure, which indicates that chronic conditions are indeed monitored. *Id.* Further, as to Plaintiff's anemia specifically, Plaintiff did not require any follow-up care because he did not suffer from a serious medical condition, and there is no indication that his prior medical history would have changed the course of his treatment in April 2019.

Regarding Plaintiff's allegation that Wexford maintains a policy a practice of not ordering a CBC panel during physical exams, there does appear to be such a policy. However, in Defendant Wexford's response to Plaintiff's Request for Admissions, Defendant Wexford states that Wexford "qualifies the admission to state that the Complete Blood Count tests are not performed during routine Offender Physical Examinations, which occur every two years, *unless clinically indicated.*" (Doc. 68, p. 17) (emphasis added). Thus, there is an important caveat to this policy. While a CBC panel will typically not be ordered for a routine physical exam, it will if it is clinically indicated. This caveat is important because the decision to order bloodwork is typically left to the discretion of the treating physician. Here, the evidence in the record was insufficient to establish that Plaintiff was experiencing an acute bout of anemia before April 2019. Thus, a CBC panel was not clinically indicated. As such, the physician's decision not to run bloodwork on Plaintiff was justified.

Lastly, Plaintiff attempts to assert that Wexford maintains a policy and procedure of only providing Tylenol and Ibuprofen for pain relief. Again, Plaintiff's own medical

records do not support the existence of such a policy or procedure. Plaintiff previously received both Norco and Ultram for pain relief. (Doc. 84, Exh. 1, p. 63-66). While opioids are generally disfavored for long-term relief, it is evident that medical providers within the IDOC will order prescription strength medications for pain relief when it is clinically indicated.

In the final analysis, Plaintiff has simply not provided sufficient evidence for a reasonable jury to rule in his favor on any of his *Monell* theories. Therefore, Defendants' Motion for Summary Judgment as to Count 3 is **GRANTED**.

CONCLUSION

Accordingly, the Court **GRANTS** Defendant's Motions for Summary Judgment (Doc. 83, 86). The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendant Venerio Santos, Defendant Wexford Health Sources, Inc., and Defendant Deborah Blackburn, and against Plaintiff Mitchell Morrow with prejudice and to close the case.

**IT IS SO ORDERED.**

**DATED:  March 30, 2023.**

Digitally signed by Judge Sison
Date: 2023.03.30 13:03:01 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**